**L.B. SALES CORPORATION, a Wisconsin corporation, Plaintiff,**

v.

**DIAL MANUFACTURING, INC., an Arizona corporation, Defendant.**

**Civ. A. No. 83–C–1896.**

United States District Court, E.D. Wisconsin.

Aug. 30, 1984.

Joseph M. Troy, Appleton, Wis., for plaintiff.

Francis R. Croak, Renee M. Martin, Milwaukee, Wis., and Martin Aronson, Phoenix, Ariz., for defendant.

### DECISION AND ORDER

REYNOLDS, Chief Judge.

This is an action for an alleged breach of contract. The case was commenced in Winnebago County Circuit Court and was removed here pursuant to 28 U.S.C. §§ 1441(b) and 1332. Presently before the Court is defendant's motion for dismissal on the grounds of lack of personal jurisdiction or, alternatively, for a change of venue. The motion is denied.

Plaintiff L.B. Sales Corporation ("L.B. Sales") is a Wisconsin corporation with its principal place of business in Butte des Morts, Wisconsin. It is engaged in the business of machine design, engineering and fabrication. Defendant Dial Manufacturing Corporation ("Dial") is an Arizona corporation with its principal place of business in Phoenix. Defendant is in the business of manufacturing machinery, including cooler pad equipment.

On October 6, 1977, Duane Johnston, the president of Dial, wrote to Loren Brickham, the president of L.B. Sales, at the latter's home in Wisconsin, soliciting his services for the design and production of cooler pad equipment. At that time, Johnston expressed to Brickham a desire to keep the request confidential. At the time, Brickham was retired but had many years of engineering experience with a competitor of Dial's.

By correspondence dated November 3, 1977, Brickham confirmed to Johnston that arrangements had been made with a machine shop in Wisconsin for building much of the machinery Johnston required. Brickham also stated that "[i]f most of the

work could be done in this area your competition would not know of your intentions for quite some time."

Thereafter, Brickham conducted a "feasibility study" for Dial that included a patent search. Brickham sent a report to Dial on February 10, 1978. At this time, Brickham encountered certain health problems, and on April 8, 1978, informed Dial that he would be unable to perform further engineering services for Dial. He requested payment from Dial for preliminary drafts prepared by two Wisconsin residents, and told Dial he would contact them if he became able to develop plans on his own.

Johnston subsequently contacted Brickham and expressed his wish that Brickham continue in the design and supervision of the project. They discussed hiring additional draftsmen and engineers to assist Brickham.

They ultimately agreed to an arrangement whereby L.B. Sales would continue to design, engineer and supervise the development of one automatic evaporative cooler pad machine and three excelsior machines. L.B. Sales would furnish all facilities and personnel required for engineering and drafting services, and would have authority to engage and discharge those personnel subject to Dial's approval. In return for L.B. Sales's services, Dial was to pay L.B. Sales $1,800 per month for forty-eight months commencing May 1, 1978, and compensation for reasonable expenses. Dial further agreed to pay the sums of $1,000 per month and $500 per month for the services of an outside engineer and a draftsman. The salaries were to be billed to, and paid directly by, Dial. Finally, the cost of prefabricated machine parts and equipment was to be invoiced directly to Dial, and paid by Dial directly to the supplier.

Between May, 1978 and April, 1980, L.B. Sales arranged numerous contracts between Dial and various Wisconsin businesses for the production and assembly of parts of the machines, and engaged the services of a Wisconsin engineer and a Wisconsin draftsman. L.B. Sales thereafter super-

vised the production of the parts and machinery, and the design and draftwork. All of the work done by L.B. Sales between May 1, 1978 through April, 1980 was done in Wisconsin. With the exception of certain knives, all of the individual components were fabricated in Wisconsin and initial assembly was done in Wisconsin.

Pursuant to the May, 1978 agreement, Dial issued monthly drafts to the draftsman and the engineer, and issued drafts to the suppliers upon receipt of invoices. Dial also issued a letter stating that Brickham "is an authorized representative of our firm for the purpose of manufacturing excelsior and cooler pad machines. Accordingly, Mr. Brickham may authorize such work as is necessary for the manufacture of this equipment." Brickham used this letter as authority to bind Dial to numerous contracts with the Wisconsin businesses participating in the project.

The completed machinery was shipped to Arizona in April, 1980. Dial accepted delivery of the machines and paid for them pursuant to the agreement. Brickham went to Arizona to supervise assembly and initial startup of the machines. Certain modifications were required in order for the machines to perform as intended.

On April 22, 1980, the May, 1978 agreement was renegotiated at a meeting in Phoenix, Arizona. The result of the negotiations was apparently to delete provisions in the May, 1978 agreement pertaining to construction of additional machines and future monthly payments contingent on profitability, although this is a fact in dispute.

Dial ceased making payments under the renegotiated agreement in December, 1982, but resumed them when Brickham threatened suit. In early 1983, Dial sought L.B. Sales's services and, by letter of April 19, 1983, requested that Brickham travel to Phoenix to perform services under the renegotiated agreement. Brickham refused, and Dial again ceased making payments. This suit followed.

Dial's manufacturing plant, administrative offices, and other support facilities are

located in Phoenix with the exception of a warehouse in El Paso, Texas. It has never maintained an office, distributor, telephone listing, sales representative, advertising listing, property, or bank deposits in Wisconsin. It has never sent an officer, agent, or employee to Wisconsin, nor has it had any other kind of contact with Wisconsin except for the events that gave rise to this action. Additionally, the May 1978 agreement did not require that any of the suppliers, designers or engineers be residents of Wisconsin, or that their work be performed in Wisconsin.

The industry in which Dial competes is centered in the southwestern United States. However, a competitor named American Excelsior, which is headquartered in Texas, has a facility in Wisconsin as well as several other states. Dial concedes that at the outset of its negotiations with L.B. Sales, confidentiality was a primary consideration. However, it revealed its intent to produce excelsior-related items at an auction in New Mexico in early 1978. Dial views this as negating any contract for confidentiality between itself and L.B. Sales.

Brickham, plaintiff's principal witness, is seventy-two years old, and his health has deteriorated since April of 1978. All of plaintiff's witnesses reside in Wisconsin, and all of plaintiff's business records, including the original plans and contract, are located in Wisconsin. None of plaintiff's witnesses are employees of plaintiff. By contrast, most of defendant's witnesses are its own employees, who reside in Arizona. The machinery in question is located in Arizona. The alleged breach of the renegotiated agreement occurred in Arizona.

### A. Personal Jurisdiction

■ Where federal subject matter jurisdiction is predicated on diversity, a federal court will have jurisdiction *in personam* only if a court of the state in which it sits would have jurisdiction *in personam*. Fed.R.Civ.P. 4(d)(7), (e). The relevant statute, Wis.Stat. § 801.05, provides in pertinent part:

A court of this state having jurisdiction of the subject matter has jurisdiction over a person served in an action pursuant to s. 801.11 under any of the following circumstances:

\* \* \* \* \* \*

(5) **Local services, goods or contracts.** In any action which:

(a) Arises out of a promise, made anywhere to the plaintiff or to some 3rd party for the plaintiff's benefit, by the defendant to perform services within this state or to pay for services to be performed in this state by the plaintiff; or

(b) Arises out of services actually performed for the plaintiff by the defendant within this state, or services actually performed for the defendant by the plaintiff within this state if such performance within this state was authorized or ratified by the defendant; or

\* \* \* \* \* \*

(d) Relates to goods, documents of title, or other things of value shipped from this state by the plaintiff to the defendant on the defendant's order or direction;
. . . .

If the statutory requirements are satisfied, there arises a rebuttable presumption that due process requirements have been satisfied, so that the defendant is amenable to suit. *See, Zerbel v. H.L. Federman & Co.,* 48 Wis.2d 54, 179 N.W.2d 872 (1970), *appeal dismissed,* 402 U.S. 902, 91 S.Ct. 1379, 28 L.Ed.2d 643 (1971). In this case, the requirements of Wis.Stat. § 801.05 have been met.

This does not end the matter, because it may be that the unique facts of this dispute do not establish minimum contacts between Dial and the State of Wisconsin, so that to compel Dial to defend itself here would offend traditional notions of fair play and substantial justice under the due process clause of the Fourteenth Amendment. *See Helicopteros Nacionales de Columbia v. Hall,* —— U.S. ——, ——, 104 S.Ct. 1868, 1871, 80 L.Ed.2d 404 (1984). In this context, recourse is taken to federal law, because the pronouncements of state courts

on the United States constitution are not binding. *Lakeside Bridge & Steel Co. v. Mountain State Construction Co.*, 597 F.2d 596, 599 (7th Cir.1979), *cert. denied*, 445 U.S. 907, 100 S.Ct. 1087, 63 L.Ed.2d 325 (1980).

In *Lakeside*, the Wisconsin plaintiff solicited from the foreign defendant a contract to manufacture structural assemblies for a dam project. The plaintiff traveled to the defendant's offices and there made its proposal. Defendant accepted the proposal by mailing a purchase order to plaintiff, who modified it and returned it to defendant. The modification was treated as effective, and after telephone conversations and mailed correspondences between the parties, the purchase order was returned to plaintiff. It provided that the assemblies were to be supplied by the plaintiff "F.O.B. SELLERS PLANT MILWAUKEE, WISCONSIN with freight allowed to rail siding nearest project site." Nothing was said otherwise about where the goods were to be manufactured. The goods were manufactured at plaintiff's Wisconsin plant and shipped to Virginia, where defendant accepted them. After defendant withheld part of its payment on the grounds that the goods were defective, plaintiff filed suit in Wisconsin. The events giving rise to the suit were the defendant's sole contacts with the State of Wisconsin. The Seventh Circuit determined that there were insufficient contacts to confer jurisdiction *in personam:*

> ■ Viewed realistically, the contacts with Wisconsin in this case consist solely of "[t]he unilateral activity of [one] who claim[s] some relationship with a nonresident defendant," and this "cannot satisfy the requirement of contact with the forum State." *Hanson v. Denckla*, ..., 357 U.S. [235] at 253, 78 S.Ct. [1228] at 1240 [2 L.Ed.2d 1283] [(1958)]. Although Mountain State in a sense caused the activity in Wisconsin by placing the order, the contract between the parties left Lakeside in absolute control over where it would conduct that activity, and it made this decision and conducted the activity unilaterally. Mountain State's belief, which we may assume existed, that Lakeside would choose to perform its contractual obligations in Wisconsin does not constitute an invocation of the benefits and protections of Wisconsin's laws; Mountain State did not "purposefully avail itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Id., cf. Shaffer v. Heitner, supra*, 433 U.S. [186] at 216, 97 S.Ct. [2569] at 2586 [53 L.Ed.2d 683]. Therefore, the courts of Wisconsin no more had jurisdiction over Mountain State than would the courts of England or Taiwan if Lakeside had chosen to have the goods manufactured in either of those places.

*Id.* at 603.

Dial likens this case to *Lakeside*, pointing to the facts that it has never entered Wisconsin or done business here, that its only contacts with Wisconsin are the facts that gave rise to the suit, and that Brickham was under no obligation to enlist the services of Wisconsin suppliers, engineers and draftsmen. In Dial's view, this latter factor is crucial: like the defendant in *Lakeside*, it believed that the activities would likely be performed in Wisconsin, yet that does not suffice to justify the exercise of jurisdiction.

L.B. Sales distinguishes *Lakeside* on the grounds that the contract under dispute is essentially one for services, that it was Dial who initiated the activity, that Dial's initial desire for secrecy led to a calculated choice on its part that the activities take place in a distant part of the country and that it should have foreseen the possibility of being hailed into a distant forum, and that Brickham was essentially an authorized agent of Dial.

It should be noted that Wisconsin's interest in this action is not a major factor. In some cases, the goods to be produced or the activities to be conducted in the forum state are of a dangerous nature, so that the forum state has an interest in protecting its citizens by opening its courts to actions

involving the goods or activities. *Lakeside Bridge & Steel Co.*, 597 F.2d at 602, Restatement (Second) of Conflict of Laws § 37, Comment a (1971). The parties raise this point in their briefs, but neither party explains why the machines or Brickham's activities with respect thereto could be so dangerous as to call Wisconsin's safety interests into play.

Nonetheless, I conclude that the Court has jurisdiction over Dial. First, unlike *Lakeside*, the defendant first approached plaintiff and initiated the negotiations leading to their contract. While defendant did this by letter rather than by sending an employee or agent to Wisconsin, to require that defendant be physically present in Wisconsin for this purpose would be tantamount to insisting upon a formal " 'foot-fall on the State's soil.' " *Wisconsin Electrical Manufacturing Co. v. Pennant Products, Inc.*, 619 F.2d 676, 678 n. 8 (7th Cir.1980), *quoting Erlanger Mills Inc. v. Cohoes Fibre Mills, Inc.*, 239 F.2d 502, 509 (4th Cir.1956).

Second, at the outset of the parties' relationship, Dial expressed a desire that the activities be secreted from its competitors. This factor alone cannot justify the conclusion that Dial purposefully availed itself of the privilege of doing business in Wisconsin, because the activities could have been performed anywhere other than the geographic area in which the majority of Dial's competitors conducted their business. However, it demonstrates that Dial thought it convenient to have the services and activities performed in another area of the country, and the possibility of litigation in a distant forum was a foreseeable contingency.

Third, the contract in this case was essentially one for services rather than for goods. Dial expressly conferred upon Brickham broad agency authority to seek out and engage competent suppliers, engineers and draftsmen, and to supervise their activities for Dial's benefit. In substance, Brickham was authorized to locate skilled individuals and businesses on Dial's behalf. The Seventh Circuit recognized in *Lakeside* that the distinction between a contract for goods and a contract for services could be significant to the question of personal jurisdiction, insofar as it pertains to the question of convenience to the parties, because evidence pertaining to the nature and value of services would likely come from the plaintiff and his local records. 597 F.2d at 599.

Finally, insofar as convenience to the parties bears on the due process analysis, Dial should be required to defend the case here. Brickham is elderly and infirm. Since Dial stopped making payments under the renegotiated agreement, he has been living on his social security disability benefits, and has been hospitalized several times for heart problems. Plaintiff intends to call a number of witnesses, all of whom are Wisconsin residents, but none of whom are within plaintiff's control. By contrast, many of Dial's witnesses are its own officers and employees. In this regard, traditional notions of fair play and substantial justice weigh in favor of trial here in Wisconsin.

Taken as a whole, the unique attributes of this dispute persuade me that the Court has jurisdiction over Dial. The motion to dismiss is therefore denied.

### B. Change of Venue

Dial's alternative motion for a change of venue is premised on 28 U.S.C. § 1404(a), which provides

> For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

The decision to transfer venue is committed to the broad discretion of the district court. The statute establishes a triple standard against which the facts of each case must be measured. First, the action must be one that could have been initially brought in the proposed transferee forum. Second, the transferee forum must be more convenient to the parties and the witnesses. Third, the proposed transfer must be warranted in the interests of justice. With

respect to the third factor, the district court is to consider (1) the relative ease of access to sources of proof; (2) availability of compulsory process for attendance of unwilling witnesses; (3) the cost of obtaining attendance of willing witnesses; (4) the possibility of a view of the premises; and (5) the state of the court calendars. The burden of showing the propriety of transfer rests with the defendant. In the absence of a satisfactory showing, deference will be accorded to the plaintiff's choice of forum. *Adler v. Avis Rent-a-Car System, Inc.,* 391 F.Supp. 466, 469–470 (E.D.Wis. 1975).

■ There is no serious dispute that this case could have been brought in Arizona. However, in view of Brickham's failing health and the fact that none of plaintiff's witnesses are subject to plaintiff's control, I regard Wisconsin as being the more convenient forum. With respect to the third factor, either party will be faced with the unavailability of compulsory process no matter where the action is venued. I disagree with Dial's contention that a jury view of the machinery is necessary for a just disposition of this case. I am not aware that the District of Arizona's calendar is any more crowded than this Court's, but this case has already been scheduled here, this Court having found time to try the matter within a reasonable period. As indicated earlier, the issues of access to sources of proof and the cost of ensuring witness attendance should be resolved in favor of trying the case in Wisconsin. The motion for a change of venue is denied.

THEREFORE, IT IS ORDERED that defendant's motion to dismiss or, in the alternative, for a change of venue, is denied.